**Robert W. HALL, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 99–70853.**

United States Court of Appeals, Ninth Circuit.

Submitted Jan. 8, 2001[1]
Submission Withdrawn May 11, 2001
Resubmitted Aug. 22, 2001
Filed Aug. 29, 2001
Amended Dec. 11, 2001

**1.** The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Andrew M. Mergen, Stephen M. McFarlane, Steve Herm, and Melaine Williams, Dep't of Justice, Washington, D.C., for the respondent.

Robert W. Hall, Las Vegas, Nevada, petitioner, pro se.

Before: GOODWIN, GRABER, and PAEZ, Circuit Judges.

## ORDER

PAEZ, Circuit Judge:

The Petition for Panel Rehearing or Clarification is DENIED.

The opinion filed August 29, 2001, is hereby AMENDED as follows:

1. On page 11797 [263 F.3d 926, 934] of the slip opinion, the phrase "Lacking 'force of law,'" is deleted, and the word "interpretations" is capitalized. After "SIP . . . .". and before "Interpretations" the following text and footnote is inserted: "This statement makes it clear that the SIP's reach extends only to those it directly regulates,5 and does not have 'force of law' constituting binding precedent for future SIP revisions."

2. On page 11797 [263 F.3d at 934] of the slip opinion, the following footnote number 5 is inserted: "5 The EPA, a State, or a citizen may seek

enforcement of the SIP's provisions in various venues. 42 U.S.C. §§ 7413, 7604; *see Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2nd Cir.1976); *Ohio Envtl. Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977); *Kamp v. Hernandez*, 752 F.2d 1444, 1454–55 (9th Cir.1985)."

3. On page 11798 [263 F.3d at 935] of the slip opinion, the following footnote number 6 is added at the end of Part II(A)(1) after "advocating this interpretation": "6 The present case is distinguishable from *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir.2000), in two significant respects. First, our decision in *Exxon* predated the Supreme Court's decision in *Mead;* to the extent that the analyses differ, *Mead* controls. Second, the present case is distinguishable from *Exxon.* In *Exxon*, the EPA had issued a final rule carefully explaining its interpretation of section 211(m) of the Clean Air Act. 217 F.3d at 1248–49. Here, by contrast, the EPA has never undertaken to explain its interpretation of section 110(*l*) of the Clean Air Act, affording us no basis to understand the EPA's reasoning or to assess its exegesis of the statutory text."

## OPINION

PAEZ, Circuit Judge:

In this *pro se* petition for review, Robert Hall raises procedural and substantive challenges to the Environmental Protection Agency's ("EPA") approval of a revision to the air quality plan adopted by Clark County, Nevada,[2] which modifies existing rules for new stationary sources seeking permits to emit pollutants in Clark County. The most significant issue that

Hall raises is whether the EPA adequately assessed Clark County's prospects, under its revised air quality plan, of meeting the Clean Air Act's ("CAA" or "Act") requirements concerning attainment of federally-established air quality standards. The statutory basis for this claim is the Act's requirement that the EPA determine whether air quality plan revisions will "interfere" with attainment requirements. *See* CAA § 110(*l*), 42 U.S.C. § 7410(*l*).

Although we reject Hall's procedural challenges, we conclude that the EPA's interpretation of its review responsibility under § 110(*l*) is not consistent with the Act. The EPA argues that, so long as a revision to an air quality plan does not relax existing pollution control measures, there necessarily will be no interference with attainment requirements. The EPA concluded that the revisions at issue here did not relax the preexisting rules; and so, without further inquiry, the EPA made a determination of "non-interference." This truncated analysis-which, as the EPA admits, at most assures that the rules as revised will not "exacerbate the existing situation"-does not fulfill the EPA's responsibility under § 110(*l*). That provision requires the EPA to evaluate whether the plan as revised will achieve the pollution reductions required under the Act, and the absence of exacerbation of the existing situation does not assure this result. We therefore remand this matter to the EPA for further consideration.

## I.

### *Background*

#### A. *Clean Air Act*

The Act creates a framework for the "development of cooperative Federal, State, regional, and local programs to pre-

---

**2.** Nevada has delegated authority for promulgating air quality plans for Clark County to the County. *See* Nev.Rev.Stat. 445B.500(c)(1).

vent and control air pollution." CAA § 101(a)(4), 42 U.S.C. § 7401(a)(4). Pursuant to § 109(b)(1) of the Act, the EPA sets National Ambient Air Quality Standards ("NAAQS"), "the attainment and maintenance of which ... are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). In 1971, the EPA promulgated NAAQS for six criteria pollutants, including-as relevant for our purposes-particulate matter, carbon monoxide, and ozone. 36 Fed.Reg. 8186 (1971); 40 C.F.R. pt. 50.

■ Each State must submit a State Implementation Plan ("SIP") that "specif[ies] the manner in which [NAAQS] will be achieved and maintained within each air quality control region" in the State. CAA § 107(a), 42 U.S.C. § 7407(a). As summarized by the EPA, "the purposes of a SIP ... are to make demonstrations (of how attainment, maintenance, and progress will be achieved) and to provide a control strategy that will achieve the necessary reductions and otherwise meet the requirements of the Act." *State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990,* 57 Fed.Reg. 13,498, 13,567 (Apr. 16, 1992) (hereinafter *SIP Preamble for 1990 Amendments* ). By virtue of the States' roles in devising a strategy and adopting an implementation plan, the Supreme Court has emphasized that "[i]t is to the States that the Act assigns initial and primary responsibility for deciding what emissions reductions will be required from which sources." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 470–72, 121 S.Ct. 903, 911, 149 L.Ed.2d 1 (2001).

■ There are exceptions to that primary responsibility of the States. At least since the 1970 Clean Air Act Amendments ("1970 Amendments"), the Act has required the States to regulate certain sources of emissions, including, for example, new stationary sources and automobiles, and has established a floor of minimum emissions control standards for such sources, below which the SIPs cannot go. *See Train v. NRDC,* 421 U.S. 60, 79 n. 16, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

■ State SIPs are subject to EPA review and, if inadequate, disapproval. CAA § 110(*l*), 42 U.S.C. § 7410(*l*). "The requirement that the States ... submit [SIPs] to EPA for review allows for federal oversight of the States' efforts to achieve and maintain the required level of air quality." S.Rep. No. 101–228, at 9, 1990 U.S.C.C.A.N. 3385, 3395.

**B.** *Pre–1990 Statutory Deadlines for Nonattainment Areas*

In the 1970 Amendments, Congress required the States to achieve attainment of NAAQS by 1975. *See* S.Rep. No. 101–228, at 10 (1989), 1990 U.S.C.C.A.N. 3385, 3396–97. In the 1977 Clean Air Act Amendments ("1977 Amendments"), those deadlines gave way to a new 1982 deadline, with the possibility of extensions until 1987 for certain pollutants. *See General Preamble for Proposed Rulemaking on Approval of State Implementation Plan Revisions for Nonattainment Areas,* 44 Fed.Reg. 20,372, 20,375 (Apr. 4, 1979) [hereinafter *SIP Preamble for 1977 Amendments* ]. In 1989, based on perceived "widespread failure" to meet air quality standards, Congress again considered amendments to the Act. S.Rep. No. 101–228, at 11, 1990 U.S.C.C.A.N. at 3396–97.

**C.** *1990 Amendments.*

The resulting Clean Air Act Amendments of 1990 ("1990 Amendments") established a new set of attainment deadlines. In general, the 1990 Amendments contemplated that less serious nonattainment areas would attain NAAQS within five years of enactment and that more serious nonat-

tainment areas would have 10 years to attain NAAQS. *See, e.g.,* CAA § 172(a)(2)(A), 42 U.S.C. § 7502(a)(2)(A) (setting default five and 10–year attainment deadlines); CAA § 186(a)(1), 42 U.S.C. § 7512(a)(1) (setting 1995 and 2000 deadlines for attainment of carbon monoxide NAAQS); CAA § 188(c), 42 U.S.C. § 7513(c) (setting various attainment dates for areas in moderate and serious nonattainment for PM–10, with an outside deadline of December 31, 2001, for serious nonattainment areas). In addition, the 1990 Amendments modified the statutory minimum emission controls, including the minimum emission controls for new stationary sources. *See, e.g.,* S.Rep. No. 101–228, at 24–25, 1990 U.S.C.C.A.N. at 3410–11.

The 1990 Amendments also established an elaborate timetable for States to submit various new planning documents to the EPA, revisions to the pollution control requirements of existing SIPs, and demonstrations of interim progress and, ultimately, attainment.[3] As summarized by the Senate Report: "The emphasis in the bill ... is not on the deadlines but on what happens in the period before deadlines." S.Rep. No. 101–228, at 12–13, 1990 U.S.C.C.A.N. at 3398–99. "[T]he nonattainment provisions of the bill are designed ... to require regular and monitored progress toward attainment...." *Id.*

### D. *Clark County's New Source Review Program Revisions*

At the time of enactment of the 1990 Amendments, Clark County's new source review program consisted of rules that were last approved by the EPA in 1981. 46 Fed.Reg. 21,758 (Apr. 14, 1981). The revised new source review program at issue here was approved by the EPA on May 11, 1999. 64 Fed.Reg. 25,210 (May 11, 1999).

Parts of Clark County, including the Las Vegas Valley, have been in nonattainment for particulate matter and carbon monoxide from the time of the EPA's approval of the 1981 Rules to, as far as the record shows, the present.[4] The 1990 Amendments required Clark County to submit revisions to its new source review program by November 1992. Clark County missed this deadline. But, from 1993 until submission to the EPA in 1999, Clark County engaged in an involved process of revising its new source review program. During this period, Clark County received substantial input from the EPA, the regulated community, and the public.

### E. *Hall's Petition for Review*

Hall timely filed this *pro se* petition for review. After initial briefing, we asked the EPA and Hall to submit supplemental briefs addressing the nature and scope of the EPA's SIP review responsibility under CAA § 110(*l*). We also directed the EPA

**3.** Using the required submissions related to attainment of carbon monoxide NAAQS as an example, the 1990 Amendments establish a timetable for States to submit: emissions inventories, *see* CAA § 187(a)(1), 42 U.S.C. § 7512a(a)(1); a formal modeling analysis demonstrating how a State's SIP control strategy will meet the statutory goals, *see* CAA § 187(a)(7), 42 U.S.C. § 7512a(a)(7); mobile source requirements, *see, e.g.,* CAA § 187(b), 42 U.S.C. § 7512a(b); new source review requirements, *see, e.g.,* CAA §§ 172(c)(5) & 173,

42 U.S.C. §§ 7502(c)(5) & 7503; demonstrations that milestones have been met, *see, e.g.,* CAA § 187(d)(1), 42 U.S.C. § 7512a(d)(1); and contingency plans in case forecasts prove inaccurate, *see, e.g.,* CAA § 187(a)(3), 42 U.S.C. § 7512a(a)(3).

**4.** At the time of approval of the 1981 Rules, Las Vegas Valley was designated nonattainment for ozone, but it was redesignated as having achieved attainment for ozone, in 1986.

to identify any parts of the record that demonstrate that the EPA considered whether the revised new source review program "interfere[s]" with current requirements.

In its supplemental brief, the EPA explained that it approved the Clark County new source review revisions based on the following interpretation of § 110(*l*): "If the SIP revision does not relax the existing SIP ... then the SIP revision does not 'interfere' with attainment [or] reasonable further progress ... requirements and no further inquiry is needed." The EPA reasoned that, if there was no relaxation of air quality regulations, the revision would not "exacerbate the existing situation by allowing increased emissions" and, consequently "the SIP revision would not interfere with reasonable further progress or attainment." Because the EPA determined that Clark County's revised new source review rules did not relax the rules that had been approved in 1981, it concluded, without further inquiry, that the revisions would not interfere with attainment or reasonable further progress requirements.

Because we were uncertain of the source of this interpretation, we requested a brief explaining the agency procedures and sources used in arriving at this interpretation. The EPA represented that the "no relaxation" standard discussed above served as the basis of other final rules approving and disapproving SIP revisions and that those rules were promulgated in accordance with notice-and-comment rulemaking procedures.

## II.

### Discussion

■ We will set aside the EPA's approval of a SIP only if the approval is arbitrary, capricious, or otherwise not in

accordance with law. *Ober v. EPA*, 84 F.3d 304, 307 (9th Cir.1996).

### A.

### *EPA's Review Responsibility Under § 110(l)*

Section 110(*l*) of the Act provides that "[t]he Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress ... or any other applicable requirement of this [Chapter]." 42 U.S.C. § 7410(*l*). We must determine whether the EPA properly determined that Clark County's revised new source review program would not "interfere" with the Act's attainment requirements.

#### 1. Chevron *and* Skidmore *deference*

As an initial matter, the EPA argues that, in resolving that question, we owe deference to the EPA's interpretation of § 110(*l*). EPA argues that the interpretation of § 110(*l*) applied here is "evident in and the basis of" other EPA final rules approving or disapproving SIP revisions and that, because these final rules are "promulgated after full notice and opportunity for comment by the public," the interpretation is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ Even if the interpretation at issue were evident in the other final rules that the EPA identifies, each such final rule explicitly states that nothing in the rule has precedential effect. *See, e.g.,* 58 Fed.Reg. 48,312, 48,314 (Sept. 15, 1993) ("Nothing in this action should be construed as permitting, allowing or establishing a precedent for any future request for revision to any SIP...." ). This statement makes it clear that the SIP's reach extends only to those it directly regulates,[5]

---

**5.** The EPA, a State, or a citizen may seek enforcement of the SIP's provisions in various venues. 42 U.S.C. §§ 7413, 7604; *see Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2nd

and does not have "force of law" constituting binding precedent for future SIP revisions. Interpretations of the Act set forth in such non-precedential documents are not entitled to *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2174–75, 150 L.Ed.2d 292 (2001) (holding that the "binding character" of a Customs letter "stops short of third parties," lacks the "force of law," and so is "beyond the *Chevron* pale").

■ Of course, as *Mead* reiterates, an agency interpretation that is not accorded *Chevron* deference still may be entitled to "a respect proportional to its 'power to persuade,'" based on such factors as "its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." *Id.* at 2175–76 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). But our "*Skidmore* assessment," *id.* at 2177, does not weigh in favor of the interpretation advanced in this case.

■ The interpretation advanced here does not fit with prior interpretations that the EPA has cited to us. Here, the EPA argues that, when there is no relaxation of preexisting rules, this finding conclusively establishes "non-interference." None of the final rules approving other SIP revisions that the EPA has cited to us is based on such an interpretation of § 110(*l*). This is not surprising because, in the past, the EPA has stated that "EPA ... views each type of SIP revision as presenting unique issues that should be addressed on a case-by-case basis," an assessment that has led the EPA to decline to issue any "general guidance on section 110(*l*)." 61 Fed.Reg. 16,050, 16,051 (Apr. 11, 1996). In short, the interpretation advanced here is not one applied uniformly by the EPA.

Moreover, in explaining its interpretation in the extensive briefing in this case, the EPA has not offered any explanation of how the interpretation fits within the statutory scheme that the EPA administers or reflects the EPA's considered policy judgment about how best to administer the Act. The EPA has given us no basis to conclude that the EPA has drawn on any special expertise in advocating this interpretation.[6]

### 2. *CAA § 110(l)*

■ Thus, the EPA's interpretation must stand or fall on its fidelity to statutory text, statutory structure, and legislative history. Considering those standard signposts of legislative intent, we conclude that the EPA's "no relaxation" rule, as applied in this case, is not a persuasive interpretation of § 110(*l*).

■ We start with the text of the current Act. Without further context, the text of § 110(*l*), and the provisions that it incorporates by reference, do not clearly define the nature of the EPA's review responsibility. The "applicable requirement[s] concerning attainment and reasonable further progress," CAA § 110(*l*), 42 U.S.C. § 7410(*l*), include the current attainment

---

Cir.1976); *Ohio Envtl. Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir.1977); *Kamp v. Hernandez*, 752 F.2d 1444, 1454–55 (9th Cir.1985).

**6.** The present case is distinguishable from *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir.2000), in two significant respects. First, our decision in *Exxon* predated the Supreme Court's decision in *Mead;* to the extent that the analyses differ, *Mead* controls. Second, the present case is distinguishable from *Exxon*. In *Exxon*, the EPA had issued a final rule carefully explaining its interpretation of section 211(m) of the Clean Air Act. 217 F.3d at 1248–49. Here, by contrast, the EPA has never undertaken to explain its interpretation of section 110(*l*) of the Clean Air Act, affording us no basis to understand the EPA's reasoning or to assess its exegesis of the statutory text.

deadlines and, as relevant to this case, a requirement that implementation plans include new source review regulations "as necessary to assure" attainment, CAA § 110(a)(2)(C), 42 U.S.C. § 7410(a)(2)(C). These substantive criteria are fairly clear, but, given the complexity of the task of achieving the pollution reductions required by the Act, it is less clear what it means for a particular revision to "interfere with" such requirements or what analysis the EPA must conduct to make a determination of "non-interference."

Our task is complicated by the fact that § 110(l) was first added to the Act in the 1990 Amendments, and that those Amendments made other relevant changes in the text of the Act. Therefore, in order to discern Congress' intent on the specific issue before us-the nature of the EPA's responsibility to consider attainment objectives in reviewing SIP revisions-we trace the history of the principal provisions bearing on that responsibility. From our review, we conclude that there is substantial continuity between the standards governing the EPA's SIP review before and after the 1990 Amendments, and we hold that the EPA's action in this case is inconsistent with established principles governing EPA review.

### a. SIP review provisions prior to the 1990 Amendments

Prior to the 1990 Amendments, the Act stated that the EPA "shall approve [a plan or portion of the plan] if [the EPA] determines that" it meets various substantive criteria, including, *inter alia*, that it "provide[s] for the attainment" of NAAQS by statutory deadlines, includes emissions limitations and other measures "as may be necessary to insure attainment," and includes a new source review program "as

necessary to assure" attainment. CAA § 110(a)(2), 42 U.S.C. § 7410(a)(2) (1988). The Act provided that the EPA should approve a revision if the EPA determined that it met the same criteria. *See* CAA § 110(a)(3), 42 U.S.C. § 7410(a)(3) (1988).[7]

The seminal case on the EPA's SIP review responsibility is *Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). That case concerned a narrower issue relating to the approval of source-specific variances; but, in addressing that issue, the EPA took the position, *inter alia*, that it could approve any plan revision as long as the revision did not "interfere with the attainment and maintenance of [NAAQS]." *Id.* at 74, 95 S.Ct. 1470. The Court reached a general conclusion that the EPA's interpretation of the Act was "reasonable." *Id.* And, in discussing the EPA's review function, the Court explained that the EPA's most basic responsibility in reviewing air quality plans under the Act is to determine whether "the ultimate effect of a State's choice of emission limitations is compliance with [NAAQS]." *Id.* at 79, 95 S.Ct. 1470. The Court observed that the EPA's review of *revisions* to such plans was subject to the *same* principles and basic standards as EPA review of *initial plans:* EPA "approval is subject ... to the condition that the revised plan satisfy the general requirements applicable to original implementation plans." *Id.* at 80, 95 S.Ct. 1470. Explaining the nature of the basic judgment that the EPA must make, both in approving an initial plan and in reviewing revisions, the Court stated: "[i]n each instance the Agency must measure the existing level of pollution, compare it with the national standards, and determine the effect on this comparison of specified emis-

---

**7.** The cited criteria originated with the 1970 Amendments, Pub.L. No. 91–604, 84 Stat. 1690 (1970), and were retained without

change by the 1977 Amendments, Pub.L. No. 95–95, 91 Stat. 685 (1977).

sion modifications." *Id.* at 93, 95 S.Ct. 1470. Elaborating on the nature of the judgment that the EPA must make in reviewing a revised plan, the Court stated that the EPA should disapprove a plan revision if "the plan as so revised would no longer insure timely attainment of the national standards." *Id.* at 90, 95 S.Ct. 1470. *See also id.* at 93, 95 S.Ct. 1470 (stating that a revision would be disapproved if it "cause[d] a plan to fail to insure maintenance of those standards").

Two developments after *Train* shed considerable light on the 1990 Amendments. First, after *Train,* the EPA formally reiterated its position that one of "[t]he basic criteria for approving any individual element of a submitted plan revision . . . [is] that it must . . . [n]ot *interfere with* assuring attainment . . . of the NAAQS by the required deadline, or with satisfying the Act's other requirements." *SIP Preamble for 1977 Amendments,* 44 Fed.Reg. at 20373 (emphasis added). It applied that standard to its review of revisions and, in a number of cases following *Train,* courts accepted the "non-interference" standard. *See Ohio Envtl. Council v. EPA,* 593 F.2d 24, 33 (6th Cir.1979); *United States Steel Corp. v. EPA,* 633 F.2d 671, 674 (3d Cir. 1980); *Navistar Int'l Transp. Corp. v. EPA,* 941 F.2d 1339, 1342 (6th Cir.1991).

Second, in *Abramowitz v. EPA,* 832 F.2d 1071 (9th Cir.1987), the petitioner challenged the EPA's practice of approving particular pollution control measures submitted by a State without requiring an "attainment demonstration" that would show that an implementation plan, taken as a whole, would attain NAAQS by the statutory deadlines then in effect.[8] We agreed. *Id.* at 1078. We reasoned that the Act required that a plan "provide for" attainment, that control measures adopted by a State would "assure attainment" by the deadlines, and that there was "no reference" in the Act "to a separate determination of control measures and attainment demonstration." *Id.* at 1076–77.

### b. *1990 Amendments to SIP review provisions*

 Against this background, the intent of the 1990 Amendments with regard to certain fundamentals is quite clear. In drafting current § 110(*l*), Congress incorporated into the Act the "non-interference" standard adopted by the EPA and approved by the courts. CAA § 110(*l*), 42 U.S.C. § 7410(*l*). Congress' incorporation of the "non-interference" standard into the amended Act provides a strong inference that Congress approved of pre–1990 judicial and administrative construction of that standard, at least in its outer contours. When Congress incorporates the text of past interpretations, "Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing . . . interpretations." *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). *See also Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute," and, when Congress reenacts a statute without showing disapproval of its existing interpretation, Congress is presumed "to adopt that interpretation").

---

8. An "attainment demonstration" is a formal demonstration, "by means of applicable air quality models, data bases, and other requirements specified in [the Code of Federal Regulations]," that the pollution control measures contained in an implementation plan are adequate to provide for the timely attainment and maintenance of NAAQS. 40 C.F.R. § 51.112. *See also* 40 C.F.R. §§ 51.44, 51.45, 51.46, 51.53 (1987) (setting criteria for attainment demonstration at time of *Abramowitz* ).

Although Congress adopted the "non-interference" standard and can be presumed generally to have approved pre-existing administrative and judicial interpretations of the Act consistent with that standard, Congress expressly "over-rule[d]" that "portion of ... *Abramowitz* ... which held that EPA could not approve individual measures in a plan submission without either approving or disapproving the plan as a whole." S.Rep. No. 101–228, at 22, 1990 U.S.C.C.A.N. 3385, 3408.[9] Thus, § 110(k)(3) of the amended Act permits the EPA to issue "partial approval[s]," that is, to approve the States' SIP revisions in piecemeal fashion. CAA § 110(k)(3), 42 U.S.C. § 7410(k)(3). Although the legislative history does not explicitly say so, this disapproval of *Abramowitz* strongly implies that, under the amended Act, there is no rigid requirement that the EPA always must require a formal attainment demonstration before approving plan revisions. This conclusion is borne out by the statutory scheme. The Act provides for piecemeal submission of SIP revisions, including attainment demonstrations. The Act establishes an elaborate timeline for States to submit revisions to their plans. And the Act requires formal attainment demonstrations as part of the SIP revisions the States must submit to the EPA. But the Act explicitly contemplates that those attainment demonstrations may be submitted for EPA review at different times than other elements of the States' SIP revisions (for example, revisions to control measures) are submitted for review. *See, e.g.,* CAA § 187, 42 U.S.C. § 7512a (provisions governing carbon monoxide nonattainment areas).

■■■ Synthesizing these changes, as relevant to our decision in this case, we can discern certain fundamentals about the

EPA's review responsibility. To the extent consistent with the new statutory scheme, the guidance provided in *Train* still holds. The objective of the EPA's analysis is to determine whether "the ultimate effect of a State's choice of emission limitations is compliance with [NAAQS]." *Train,* 421 U.S. at 79, 95 S.Ct. 1470. *Cf.* 63 Fed.Reg. 8,573, 8,574 (Feb. 20, 1998) ("[T]he Act charges [the EPA] with the determination as to whether the state's choices will result in attainment ... of the NAAQS."). The nature of the judgment that the EPA must make is to "measure the existing level of pollution, compare it with the national standards, and determine the effect on this comparison of specified emission modifications." *Train,* 421 U.S. at 93, 95 S.Ct. 1470. In other words, the EPA must determine the extent of pollution reductions that are required and determine whether the emissions reductions effected by the proposed revisions will be adequate to the task.

Of course, it is impossible to determine the adequacy of the emissions reductions effected by a particular component of an implementation plan unless the emissions reductions that can be expected from the rest of the plan also, at some level, enter into the analysis. The EPA must be able to determine that, with the revisions in place, the whole "plan as ... revised" can meet the Act's attainment requirements. *Id.* at 90, 95 S.Ct. 1470.

■■ Admittedly, this determination is complicated by the fact that, under the 1990 Amendments, the "plan ... as revised" is not static. The 1990 Amendments require, if not wholesale, at least substantial revisions to SIPs before the attainment deadlines. And the 1990 Amendments contemplate that a State's

**9.** Congress' specific modifications of the Act to clarify it in light of *Abramowitz* strengthens the inference that Congress was aware of the pre-existing judicial interpretation of the Act. *See Lorillard,* 434 U.S. at 581, 98 S.Ct. 866.

prospects for meeting the new attainment deadlines will depend not on any one revision to the existing SIPs, but instead on the contributions of all the contemplated revisions. Yet, when the EPA reviews a particular revision, the EPA will not have before it the plan as a whole, that is, the final plan that in the State's judgment will achieve the Act's attainment requirements. *Compare Abramowitz*, 832 F.2d at 1077–78 (holding, prior to the 1990 Amendments, that, before approving any particular component of a revised plan, the EPA was required to insist on a formal demonstration that the plan as a whole would achieve attainment). Within this statutory context, the EPA cannot be required to ignore other anticipated revisions in determining whether the State will achieve attainment. Rather, for the EPA to determine that the "plan ... as revised" can meet attainment requirements, the EPA must be able to conclude that the particular plan revision before it is consistent with the *development* of an overall plan capable of meeting the Act's attainment requirements. In other words, in the context of an evolving attainment effort, the EPA must consider the "relation of the step to the movement as a whole." [10]

### 3. *EPA's application of the "no relaxation" rule*

■ The EPA does not claim that its decision was based on any empirical analysis that "measure[d] the existing level of

pollution, compare[d] it with the national standards, and determine[d] the effect on this comparison of specified emission modifications." *Train*, 421 U.S. at 93, 95 S.Ct. 1470. Rather, the EPA claims a necessary statutory equivalence between non-relaxation of rules approved in 1981 and non-interference with current attainment requirements. The EPA's application of the "no relaxation" rule in this case cannot be squared with the Act.[11]

When, in 1981, the EPA approved Clark County's new source review program, it necessarily determined that the 1981 new source review rules, in conjunction with other components of Clark County's implementation plan, would attain NAAQS for all criteria pollutants by the 1982 and 1987 deadlines that were then in effect. *See SIP Preamble for 1977 Amendments*, 44 Fed.Reg. at 20373. Yet, during the time those 1981 Rules were in place, the Las Vegas Valley and other parts of Clark County have remained in nonattainment for carbon monoxide and particulate matter.

The EPA's approach effectively makes the emissions reductions achieved under those same 1981 Rules the baseline for determining "non-interference" with the Act's current attainment requirements. As the EPA explained, it determined that rules that did not "exacerbate the existing situation" necessarily would not "interfere" with attainment. The EPA employs a

---

10. Benjamin Cardozo, *The Growth of the Law* 6 (1934).

11. Our concern is with the EPA's analysis of the new source rules governing control measures for particulate matter and carbon monoxide in areas of Clark County that are *not* in attainment for those pollutants. Accordingly, our discussion focuses on the analysis that the EPA must conduct for pollution control measures relating to pollutants in *nonattainment* areas. Hall also appears to fault the EPA's analysis of rules governing emissions of

pollutants in areas where Clark County is in attainment for the pollutant, *i.e.*, he criticizes Clark County's revised monitoring requirements for ozone, a pollutant for which Clark County is in attainment. Our assessment of the EPA's reasoning does not apply to review of rules governing areas that are in attainment. The EPA's "no relaxation" rule clearly would be appropriate in areas that achieved attainment under preexisting rules. And we are unpersuaded that Hall has identified any other defect in the EPA's approval of such rules.

false baseline. The Act, as amended in 1990, sets new deadlines for attainment and establishes other new requirements for incremental progress towards attainment. Those current attainment requirements are the baseline from which "non-interference" is to be measured. And, given the past failure of Clark County to achieve attainment under the 1981 Rules, there is no necessary correlation between maintaining the stringency of the 1981 Rules and meeting the post–1990 attainment requirements of the Act. In short, past failure in meeting the pre–1990 attainment requirements does not suggest future success in meeting the post–1990 attainment requirements.

■ Our disagreement with the EPA's approach in this case is not intended to dictate the appropriate means for the EPA to assess the adequacy of evolving State efforts to meet attainment requirements. But we do require that the EPA's analysis reflect consideration of the prospects of meeting current attainment requirements under a revised air quality plan.

■ If it is evident that the EPA has considered this statutorily-mandated question, and if the EPA's analysis is not otherwise inconsistent with the Act or other law, we will overturn the EPA's judgment only if "arbitrary, capricious, [or] an abuse of discretion." *Ober v. EPA*, 84 F.3d at 307. Given the complexity of the task, a wide range of factors may be relevant to the EPA's review. Indeed, we have no difficulty imagining situations in which the absence of relaxation of preexisting rules, considered in the broader context of an area's efforts to meet current

attainment requirements, may be a decisive consideration in approving SIP revisions.[12] But, if a court is to uphold the EPA's decision, the EPA's analysis must "rationally connect[ ]" its approval of particular plan revisions before it to its assessment of an area's prospects for meeting current attainment requirements. *See Ober v. Whitman*, 243 F.3d 1190, 1195 (9th Cir.2001) (citing *Southwestern Penn. Growth Alliance v. Browner*, 121 F.3d 106, 117 (3d Cir.1997)).

■ In sum, in the administrative record before us, we find no analysis that connects the non-relaxation of the 1981 Rules to Clark County's prospects for meeting the current attainment requirements. "If the decision of the agency is not sustainable on the administrative record made, then the ... decision must be vacated and the matter remanded ... for further consideration." *F.P.C. v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (internal quotation marks and citation omitted).

### B.

### *Procedural Issues*

■ The EPA's approval of the new source review revisions is an informal rulemaking subject to the notice-and-comment requirements of the Administrative Procedure Act ("APA"), in addition to procedural requirements imposed by the Clean Air Act and implementing regulations. *See Ober v. EPA*, 84 F.3d at 312.

Hall raises a number of challenges to the procedures that were followed in pro-

---

**12.** Thus, we do not hold that the EPA never can rely on past approval of rules in approving revisions that are equally stringent. It can, so long as no intervening developments have undermined the soundness of the prior approval. *See United States Steel Corp.*, 633 F.2d at 674 (holding that, when a prior deter-

mination had been made that emission reductions under existing emission controls were adequate to meet current attainment requirements, the EPA was not required to revisit its underlying air quality analysis when approving equally stringent revisions).

mulgating and approving Clark County's revised new source review program. For the most part, his complaints focus on the adequacy of his opportunity to comment on proposed revisions during the revision process. We find no merit in his procedural arguments.

### 1. *Adequate publication of rules and revisions*

Hall first asserts that the revised new source review program rules were not adequately published either prior to public hearings in Clark County or in the EPA's notices proposing approval and then approving the new source review program.

The Act requires that SIP revisions "be adopted by [the] State after reasonable notice and public hearing." CAA § 110(*l*), 42 U.S.C. § 7410(*l*). And, with respect to EPA's action approving the SIP revisions, the APA requires that an agency engaging in informal rulemaking provide public notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

■ Clark County held at least four public hearings to consider the new source review revisions. Prior to the last three hearings, the County placed notices in local newspapers. Those notices briefly described the subject of the rules at issue and the proposed changes. The notices also instructed interested members of the public to call a designated telephone number to receive proposed amendments by mail. In addition, the EPA, in its Notice of Proposed Rulemaking of July 28, 1995, described the nature of the rule revisions at issue and the deficiencies that the EPA had identified, and notified members of the public that copies of Clark County's submittal were available for inspection at identified locations in Las Vegas and elsewhere. And, finally, in its Final Rule published on May 11, 1999, the EPA described

the nature of the rule revisions, the deficiencies it had identified, and how Clark County had corrected those deficiencies. Again the EPA identified locations where the actual text of the submitted rules could be inspected.

■ There is no rigid requirement that either the States or the EPA publish the text of proposed SIP revisions. *See* 5 U.S.C. § 553(b)(3) (providing that, in its notice of proposed rulemaking, an agency may set forth "either the terms or substance of the proposed rule *or* a description of the subjects and issues involved") (emphasis added); *Conn. Fund for the Env't, Inc. v. EPA,* 696 F.2d 179, 185–86 (2d Cir.1982) (declining to overturn notice that offered brief description of complex plan revisions). Notice is adequate if it is sufficient to provide the public with a meaningful "opportunity to comment on [the proposed] provisions." *Ober v. EPA,* 84 F.3d at 316; *see also Mo. Limestone Producers Ass'n v. Browner,* 165 F.3d 619, 622–23 (8th Cir.1999) ("an agency's notice is sufficient if it allows interested parties to offer informed criticism and comments") (citations and internal quotation marks omitted); *Conn. Fund,* 696 F.2d at 186 (inquiring whether State's notice was adequate to apprise public of nature of SIP revisions and to facilitate comment). The notices in this case provided a meaningful opportunity to comment.

### 2. *Continued revision after the EPA's proposed rulemaking*

■ On July 28, 1995, the EPA published a Notice of Proposed Rulemaking, in which the EPA identified a number of "deficiencies that must be corrected" and proposed to approve Clark County's new source review program "contingent upon Clark County correcting existing deficiencies in its [new source review] ... submittal before EPA promulgates a final rule-

making on this submittal." The EPA characterized its action as a "propos[al] to approve, with disapproval in the alternative." Between the date of this conditional approval and the EPA's final approval of the revised new source review program, Clark County accepted substantial further comment from the public and suggestions from the EPA and made further revisions to the revised program based on those comments and suggestions.

Hall asserts that it was improper for the EPA to issue a proposed "conditional" approval of Clark County's revisions in 1995. He further complains that, after the EPA's proposed "conditional" approval, it was impermissible for Clark County to accept further suggestions for change from the EPA. Hall's objections on both counts appear to be premised on his contention that he was deprived of an opportunity to review the final product-the final revised new source review program accepted by the EPA-and offer his comments on that final product. Indeed, Hall suggests that "public notice and hearing" was required "after all changes or amendments were complete."

■ The short answer to Hall's contention is that the EPA did not have an obligation to seek comments on a finalized, revised new source review program, and Hall had no right to comment "after all changes ... were complete." The APA requires an agency to: (1) publish a general notice of proposed rulemaking; (2) give interested parties an opportunity to participate in the rulemaking through submission of data, views, and arguments; and (3) adopt a rule after consideration of the relevant matter presented. *See Ober v. EPA*, 84 F.3d at 312.

■ Because the point of notice-and-comment rulemaking is that public comment will be considered by an agency and the agency may alter its action in light of those comments, there obviously is no re-

quirement that the notice that initiates the process (the notice of proposed rulemaking) announce the final rule that ultimately is adopted. The final rule permissibly may differ from versions that were presented to the public in the notice of proposed rulemaking. *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 421 (D.C.Cir. 1994) (approving provision that "appeared for the first time in the final rule"). The public's right to comment is protected if "the final rule is a logical outgrowth of the proposals on which the public had the opportunity to comment." *Id.* (internal quotation marks and citations omitted).

In this case, the public had ample opportunity to comment on the various drafts of Clark County's new source review revisions that existed between 1993 and final approval by the EPA in 1999. And the final new source review revisions approved by the EPA in 1999 were a "logical outgrowth" of the revisions and suggested corrections identified in the EPA's 1995 Proposed Rulemaking.

### 3. *Untimely submission by the State of Nevada*

■ Finally, Hall argues that, after Clark County approved its revised new source review program and submitted the program to the State of Nevada, Nevada failed to submit the revisions to the EPA in a timely fashion. Under 40 C.F.R. § 51.104(b), Nevada was required to submit the SIP revisions to the EPA within 60 days after Clark County's approval. The EPA concedes that Nevada failed to do so. However, as the EPA argues, Hall does not identify any way in which this delay prejudiced him. Ordinarily, we will not overturn agency action in the absence of some prejudice. *See* 5 U.S.C. § 706 (in reviewing agency action, "due account shall be taken of the rule of prejudicial error"). Because Hall has failed to identi-

fy any prejudice from the delay, no action is warranted.

### III.

### *Conclusion*

To the extent that we disapprove the EPA's action, it is because we question whether the EPA properly assessed the adequacy of the revised new source review program to the task of meeting current attainment requirements. In light of the limited record before us and our circumscribed view of the broader context of pollution reduction efforts in which this case arises, we are well aware of the limits of our own ability to fashion an appropriate remedy. That task remains for the EPA, in the first instance. We vacate EPA's approval and remand for further consideration whether Clark County's revised new source review program "interferes with" the Act's attainment requirements. Each party is to bear its own costs.

PETITION GRANTED IN PART, DENIED IN PART, and REMANDED.