**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASSOCIATION OF IRRITATED
RESIDENTS,
                    *Petitioner,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL
LEAVITT, in his official capacity as
Administrator of the U.S.
Environmental Protection Agency,
WAYNE NASTRI, in his official
capacity as Regional Administrator
for Region IX of the U.S.
Environmental Protection Agency,
and DEBORAH JORDAN, in her
official capacity as Acting
Regional Administrator Region IX
of the U.S. Environmental
Protection Agency,
                    *Respondents,*

SAN JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT;
CALIFORNIA AIR RESOURCES BOARD,
            *Intervenors-Respondents.*

No. 04-72650

EPA No.
Fed. Reg. 69

12383

MEDICAL ADVOCATES FOR HEALTHY
AIR; LATINO ISSUES FORUM; SIERRA
CLUB,
                                *Petitioners,*

                v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL
LEAVITT, Administrator, U.S.
Environmental Protection Agency
and WAYNE NASTRI, Regional
Administrator, Region IX, U.S.
Environmental Protection Agency,
                                *Respondents,*

SAN JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT;
CALIFORNIA AIR RESOURCES BOARD,
                *Intervenors-Respondents.*

No. 04-72736

EPA No.
Clean Air 40 CFR

OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
June 15, 2005—San Francisco, California

Filed September 6, 2005

Before: Mary M. Schroeder, Chief Judge,
William C. Canby, Jr., Circuit Judge, and
Kevin Thomas Duffy,* Senior Judge.

Opinion by Chief Judge Schroeder

*The Honorable Kevin Thomas Duffy, Senior United States District
Judge for the Southern District of New York, sitting by designation.

## COUNSEL

Susan Britton, Earth Justice, Oakland, California and Brent J. Newell, Center on Race, Poverty & Environment, San Francisco, California, for the petitioners.

David A. Carson, United States Department of Justice, Denver, Colorado, Philip M. Jay, Fresno, California, and Gavin G. McCabe, San Francisco, California, for the respondents.

## OPINION

SCHROEDER, Chief Judge:

This is an expedited review of the Environmental Protection Agency's May 26, 2004 final approval of the San Joaquin Valley's 2003 PM-10 Implementation Plan (Plan). 69 Fed. Reg. 30,006. In approving the Plan, the EPA has set a new deadline for the Valley to attain the national ambient air quality standard for PM-10 pollutants, which are various airborne fine particles of less than ten microns in diameter. The new deadline is 2010.

The petitioners, whose challenges have been consolidated, are the following groups and non-profit organizations: Asso-

ciation of Irritated Residents (AIR), Latino Issues Forum, Medical Advocates for Healthy Air, and the Sierra Club. They maintain that under the Clean Air Act, the absolute outside deadline for PM-10 areas to attain the air quality standard is 2006.

Petitioners raise a number of issues, but the most significant is the EPA's authority to set a deadline that extends past 2006. We deny the petitions for review because we hold that the 2010 deadline was authorized within the structure of the Act, and that petitioners' other challenges to the Plan do not warrant judicial intervention.

## Background

The Act establishes a comprehensive program requiring cooperation between states and the federal government to improve the nation's air quality. 42 U.S.C. §§ 7401-7671q. The Act also sets up a scheme under which the public is given significant opportunities to offer input and criticism at various stages of each state's efforts to achieve better air quality. *See, e.g.,* 69 Fed. Reg. 30,006. States carry most of the burden of furthering the Act's purposes by developing implementation plans after extensive public involvement. These petitioners have participated throughout this process for the Valley at each opportunity for notice and comment. The Valley's efforts to control PM-10 pollution over the past decade illustrate the flexible, cooperative and incremental nature of the Act. *See, e.g.,* 42 U.S.C. § 7410(a)(2)(A).

California's San Joaquin Valley is the heart of the state's top agricultural region, producing a wide variety of fruits and vegetables. It is bordered on the west by the coastal mountain ranges, and on the east by the Sierra Nevada mountains including Yosemite, Kings Canyon and Sequoia National Parks. Unfortunately, the same fertile soil that has led the region to be known as the state's "salad bowl" has also contributed to high population growth and industry which,

together with the region's topography, have resulted in severe air quality difficulties.

PM-10 pollution results largely from agricultural operations and dust kicked up on roads. It is a serious problem in the Valley. The EPA has recognized that this pollutant can cause damage to lung tissue, chronic illness and premature death. 63 Fed. Reg. 41,326 (August 3, 1998); 62 Fed. Reg. 38652 (July 18, 1997); *see also Vigil v. Leavitt*, 381 F.3d 826, 830 (9th Cir. 2004). Congress addressed this problem in 1990 when it amended the Act to include specific provisions dealing with PM-10 pollution, and set an attainment deadline of December 31, 2001 for seriously deficient areas. 42 U.S.C. § 7513(c)(2).

Pursuant to the 1990 amendments to the Act, the Valley was designated a "moderate" PM-10 area by operation of law. *See* 56 Fed. Reg. 11101, 11103 (March 15, 1991). California subsequently directed the San Joaquin Valley Unified Air Pollution Control District (District), a state regulatory agency, to develop and adopt a comprehensive air pollution control strategy calling for the implementation, maintenance and enforcement of PM-10 air quality standards in the Valley. The District's plans and plan revisions were eventually forwarded to the California Air Resources Board (CARB) for review and inclusion in the state's air pollution plans. Every state plan or plan revision must be adopted by the state after reasonable notice and hearing. *See* 42 U.S.C. § 7410(a)(1). Ultimately, the state adopts the plans and forwards them to the EPA for approval.

In 1993, after various exchanges between the District and the EPA, the EPA found that the Valley could not practicably attain the PM-10 standard by the statutory deadline for "moderate areas," which was December 31, 1994. The EPA thus reclassified the Valley as a "serious area." 58 Fed. Reg. 3334, 3337 (Jan. 8, 1993). This reclassification meant that the Valley's attainment deadline was changed to December 31, 2001. 42 U.S.C. § 7513(c)(2); 58 Fed. Reg. at 3340.

California submitted a "serious area" plan to the EPA in July 1997. *See* 69 Fed. Reg. 5412, 5413 (Feb. 4, 2004). That plan included a request for a five year extension of the attainment date under § 188(e) of the Act.

In early 2002, the EPA indicated that it would disapprove the 1997 Plan for the Valley, so the state withdrew it. In July 2002, the EPA found that the Valley had failed to attain the required standards by the December 31, 2001 deadline. 67 Fed. Reg. 48,039 (July 23, 2002). The state was then required to submit plan revisions under § 189(d). The revisions had to provide for attainment, as well as for five percent annual reductions of PM-10 pollutants. Following the required notice and hearing, California adopted and submitted still another plan in August 2003.

In May 2004, after another notice and comment period during which petitioners, among others, raised most of the concerns at issue here, as well as many others, the EPA approved the 2003 Plan. That Plan established a new attainment goal of December 2010. The EPA's approval of the 2003 Plan effectively certified that the new 2010 deadline complied with the Act's general provisions for changing attainment deadlines that have passed. That approval is the subject of this petition for review, in which the petitioners claim, inter alia, that the EPA could not, as a matter of law, have approved the new deadline using those general provisions. There has been extensive briefing by all parties, including the District and CARB, who have intervened in support of the EPA's plan approval.

### The PM-10 Attainment Deadline

[1] Under the Act, there are essentially two statutory pathways through which PM-10 attainment deadlines may be changed. The first applies generally to all pollutants, and is the one that the EPA relied on here in setting the 2010 deadline. The second applies only to PM-10 pollutants. The peti-

tioners argue that the existence of the second pathway forecloses use of the first for PM-10 pollutants, and creates an outside attainment date of December 2006.

Under the Administrative Procedure Act, the EPA's final action in this case may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g., Vigil v. Leavitt*, 381 F.3d 826, 833 (9th Cir. 2004). We deal with an issue of law. We conclude that the EPA properly relied on the Act's general provisions in approving the 2010 deadline. We turn to the relevant provisions.

**[2]** Serious PM-10 areas, such as the Valley, that missed the December 31, 2001 deadline, were required to submit further plan revisions to bring about annual PM-10 or PM-10 precursor reductions of five percent. 42 U.S.C. § 7513a(d). The section reads:

> Failure to attain — In the case of a Serious PM-10 nonattainment area in which the PM-10 standard is not attained by the applicable attainment date, the State in which such area is located shall, after notice and opportunity for public comment, submit within 12 months after the applicable attainment date [December 31, 2001], plan revisions which provide for attainment of the PM-10 air quality standard and, from the date of such submission until attainment, for an annual reduction in PM-10 or PM-10 precursor emissions within the area of not less than 5 percent of the amount of such emissions as reported in the most recent inventory prepared for such area.

42 U.S.C. § 7513a(d). This section does not itself, however, establish any new attainment deadline dates. The EPA thus looked to the method of deadline change generally set forth in § 179(d). That section reads:

> (d) Consequences for failure to attain — (1) Within one year after the Administrator publishes the notice under subsection (c)(2) of this section (relating to failure to attain), each State containing a nonattainment area shall submit a revision to the applicable implementation plan meeting the requirements of paragraph (2) of this subsection.

42 U.S.C. § 7509(d)(1). Section 179(d)(3) then provides for a new attainment date five years from the date of the EPA's notice that an area has failed to attain any pollutant's applicable standard. That section also provides that the five year period can be extended five additional years as follows:

> (2) Attainment dates for nonattainment areas — (A) The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date of the notice under section [179(c)(2)], except that the administrator may extend the attainment date to the extent the administrator determines appropriate, for a period no greater than 10 years from the date of the notice under section [179(c)(2)], considering the severity of nonattainment and the availability and feasibility of pollution control measures.

42 U.S.C. § 7502(a)(2)(A)(with substitutions per 42 U.S.C. § 7509(d)(3)). In sum, § 179(d) authorizes the EPA to approve of plan revisions which set forth a new attainment date up to ten years from the time that the EPA has found that the area failed to attain the applicable air quality standard. Since the EPA published notice of the Valley's failure to attain the PM-10 standard in July 2002, the new, and here challenged, 2010 deadline would be authorized under these provisions.

**[3]** The petitioners, nevertheless, argue that the existence of a statutory provision specifically enabling a state to request a five year extension of the PM-10 deadline forecloses the EPA's application of the general method of changing any attainment deadline that has already passed. Petitioners rely on § 188(e), which is under Subpart 4 of the Act dealing specifically with PM-10 plans. That section sets out the requirements for a state to request a one time only, five year extension of the PM-10 deadline. It reads:

> Upon application by any State, the Administrator may extend the attainment date for a Serious Area beyond the date specified under subsection (c) of this section, if [1] attainment by the date established under subsection (c) of this section would be impracticable, [2] the State has complied with all requirements and commitments pertaining to that area in the implementation plan, and [3] the State demonstrates to the satisfaction of the Administrator that the plan for that area includes the most stringent measures that are included in the implementation plan of any State or are achieved in practice in any State, and can feasibly be implemented in the area. . . . The Administrator may grant at most one such extension for an area, of no more than 5 years.

42 U.S.C. § 7513(e). No language in Subpart 4 prohibits the EPA's application of the general provisions to change attainment deadlines. To support their position that the PM-10 specific provisions under Subpart 4 are exclusive, petitioners argue that allowing the EPA to look beyond those provisions to use the more general provisions in this case would allow a state to circumvent the 2001 deadline by waiting for the date to pass, rather than asking for an extension. The petitioners also claim that the EPA's interpretation would allow for countless ten year extensions without any repercussions.

**[4]** Petitioners' position is not, however, supported by the overall statutory scheme. There are repercussions for failing

to attain the standard by the applicable deadline. An area that simply waits for the deadline to pass without requesting a deadline extension suffers an additional consequence of having to reduce its emissions by five percent annually. 42 U.S.C. § 7513a(d). This consequence imposes a significant burden on the nonattaining area. The quota also helps ensure that the area will eventually be forced to achieve attainment. Moreover, if a state neglects to implement such a newly approved revised plan, that state eventually faces very severe sanctions including loss of highway funding. 42 U.S.C. § 7509(b). Indeed, the petitioners' interpretation would leave the EPA with no ability to set a new date at all once a PM-10 area has missed its deadline. Their position must be rejected. We therefore conclude that the statutory scheme authorizes the EPA to look to § 179(d) in order to set a new attainment deadline once the EPA has determined that a PM-10 area has failed to attain the standard. The EPA's interpretation of the Act, looking to the general provisions to provide an alternative path for setting a new PM-10 attainment deadline, is the correct interpretation of the statutory provisions that, when viewed in the full statutory context, are not ambiguous. *See Chevron, USA v. NRDC*, 467 U.S. 837, 842-45 (1984).

## Other Contentions

### A.  Methods Required to Achieve Additional Five Percent Reductions

The petitioners' next argument relates to the precise methods used to achieve the five percent reductions mandated by § 189(d) and discussed in the previous section. 42 U.S.C. § 7513a(d). The petitioners claim that to meet the five percent requirement for a given year, the Valley cannot plan to use reductions from previously required or implemented emissions control measures. In environmental language, the petitioners claim that Congress intended to exclude reductions resulting from "best available control measures" (BACM) in

determining whether the five percent reductions required under § 189(d) have been achieved.

"Serious" areas such as the Valley must implement BACM as opposed to the "reasonably available control measures" required of "moderate" areas. 42 U.S.C. § 7513a(a)1, (b)(1). BACM measures must be implemented within four years of reclassification. 42 U.S.C. § 7513a(b)(1)(B). The Valley was required to implement BACM by 1997, well before the area's original attainment deadline. Section 189(d), requiring the additional five percent reductions, however, takes effect only after an area has missed its attainment deadline. By allowing the state to use BACM to meet that five percent requirement, the petitioners claim that the EPA is eviscerating the "tighten the screws" purpose of § 189(d).

[5] The language of § 189(d), however, does not specifically require that an area use any particular method to achieve reductions. Although the Valley was supposed to implement BACM before the Valley missed the deadline and thereby triggered the additional five percent reduction requirement, emissions reductions from BACM are presumably intended to continue as long as they are effective, and late implementation is better than none. The Plan is therefore sound as a matter of statutory policy, and the language of the Act does not in any way prohibit or limit the use of particular emissions-reducing measures, including BACM, in calculating whether the additional reductions have been achieved.

A review of other similar provisions in the Act further supports this result. For example, Congress knew how to provide that certain control measures would not be counted towards percentage reduction requirements, for it expressly did so in provisions dealing with ozone attainment. 42 U.S.C. § 7511a(b)(1)(D) (excluding emissions reductions from various measures, including those related to motor vehicle exhaust, from counting towards an additional 15% reduction requirement). Congress similarly must have known that

reductions from BACM would continue to occur even after attainment dates, and yet did not include any similar language in § 189(d) to preclude crediting such reductions toward an area's five percent requirement. The Act permits crediting BACM reductions. The EPA interpreted the Act correctly when it approved this portion of the Valley's plan.

### B.   Crediting Excess Reductions to Meet Requirement in Later Years

The petitioners' next argument also relates to the Act's requirement that the Plan accounts for an annual five percent reduction in emissions. The petitioners argue that the EPA violated § 189(d) by allowing the Plan to credit excess emissions reductions in one year towards later, possibly deficient, years, instead of insisting on a five percent reduction per year.

[6] Section 189(d) requires "an annual reduction in PM-10 or PM-10 precursor emissions within the area of not less than 5 percent." 42 U.S.C. § 7513a(d). The petitioners argue that the word "annual" precludes the Plan's allowance for "banking" or crediting earlier emissions reductions to later years. For illustration, the petitioners argue that if an area achieves an eight percent emissions reduction in one year, it should not be able to credit the excess three percent towards the next year's five percent requirement. The EPA counters that Congress intended to provide incentives for the use of the most effective measures as early as possible, and that petitioners' interpretation would encourage areas to delay early, sizable emissions reductions in order to be able to meet the five percent requirement in subsequent years.

We agree with the EPA that prohibiting any credit for past emissions reductions under § 189(d) would discourage early reductions and conflict with the larger goals of the Act. By allowing such crediting, the EPA provides a material incentive for implementing the most effective measures as quickly

as possible. The EPA thus properly approved this portion of the Plan.

### C.   Ammonia Emissions

The petitioners' next argument concerns the Plan's rejection of control measures for major stationary sources of ammonia. The petitioners argue that the EPA improperly approved of the portion of the Plan which requires control measures for oxides of nitrogen as precursors to PM-10 pollution, but not for ammonia. The EPA found that ammonia does not contribute significantly to PM-10 levels in the Valley and that the Valley's decision to control only oxides of nitrogen was therefore reasonable.

**[7]** Ammonium nitrate, formed by a reaction between ammonia gas and oxides of nitrogen, is the largest component of PM-10 during the Valley's worst PM-10 episodes. Ammonia and oxides of nitrogen are thus precursors to PM-10 pollution. Section 189(d)'s control requirements apply to:

> major stationary sources of PM-10 precursors, except where the Administrator determines that such sources do not contribute significantly to PM-10 levels which exceed the standard in the area.

42 U.S.C. § 7513a(e). Petitioners contend that ammonia "contributes significantly" and must be subject to control measures. The EPA, however, decided to allow the District to regulate only oxides of nitrogen. According to both the EPA and the District, because "controlling ammonia in addition to [oxides of nitrogen] will not accelerate the attainment date for PM-10 in the [Valley]," ammonia does not "contribute significantly" to the Valley's PM-10 pollution. 69 Fed. Reg. at 30,007. Indeed, as the EPA pointed out, because concentrations of ammonia in the Valley are high relative to concentrations of oxides of nitrogen, controlling ammonia would not accelerate the attainment date for PM-10 in the Valley at all.

This is a determination that is scientific in nature and is entitled to the most deference on review. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *Central Arizona Water Cons. Dist. v. EPA*, 990 F.2d 1531, 1539-40 (9th Cir. 1993). There is no basis for this court to second guess the EPA's approval of that portion of the plan, particularly given the discretion vested in the EPA to consider various factors in determining whether a precursor "contributes significantly" to PM-10 levels. *See* 42 U.S.C. § 7513a(e).

### D.  Contingency Measures

The EPA did not act on that portion of the plan dealing with contingency measures in the event of future nonattainment of the new deadline. The petitioners contend that the EPA was required to take action on the state's contingency measures before it approved the remainder of the Plan. The petitioners claim that the EPA can either approve or disapprove various parts of a plan, but that the agency cannot simply refuse to take any action on a required plan element. The EPA responds that the Act authorizes piecemeal approvals and that it was therefore not required to take any action on the contingency measures when it approved the rest of the plan.

**[8]** Section 172(c)(9) requires that nonattainment areas' plans include contingency measures that will go into effect "if the area fails to make reasonable further progress, or to attain the [air quality standards] by the [applicable] attainment date." 42 U.S.C. § 7502(c)(9). The EPA acknowledges that contingency measures are a required element of the Valley's revised plan, but points out that the Act does not require the EPA to take action on all of the plan's elements at the same time. Different aspects of plan revisions are submitted at various times under the statute. A plan is thus not necessarily a single document that is prepared as a unit, and reviewed and approved in a single administrative action. This court has held that the Act permits partial or piecemeal approvals. *Hall v. EPA*, 273 F.3d 1146, 1159 (9th Cir. 2001). Such approvals

ensure that earlier-approved provisions will become federally enforceable as soon as possible. The EPA's ability to postpone action on the contingency measures is consistent with the Act's overarching goal that nonattainment areas achieve the standards as expeditiously as practicable. *See* 42 U.S.C. §§ 7502(c)(1); 7513(c)(2).

## Conclusion

In sum, the EPA has properly approved of the San Joaquin Valley's PM-10 attainment plan. The approval came after extensive public comments, and comports with the overall structure and purpose of the Clean Air Act. The petitions for review must be denied.

Petitions **DENIED**.